## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **06-01888-hb**

Adversary Proceeding Number:  **08-80034-hb**

## ORDER

The relief set forth on the following pages, for a total of 27 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**07/27/2010**



_____

US Bankruptcy Judge
District of South Carolina

Entered: 07/27/2010

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Lee Holt Judd,<br><br><br>Debtor(s). | C/A No. 06-01888<br><br>Adv. Pro. No. 08-80034 |
| Robert F. Anderson, Trustee,<br><br><br>Plaintiff(s),<br><br>v.<br><br>Carol Simpson, Lillian Maresch, Van Wilson<br>and Serepta Wilson,<br><br><br>Defendant(s). | Chapter 7<br>**ORDER** |

THIS MATTER came before the Court for trial on the Complaint of Plaintiff Robert F. Anderson ("Trustee"), seeking recovery of $231,000.00 in proceeds from the pre-petition sale of property owned by Lee Holt Judd ("Debtor"). The amount in controversy was transferred to Defendant Carol Simpson ("Simpson") and then allegedly disbursed to Defendants Van Wilson and Serepta[1] Wilson ("the Wilsons"). The Trustee seeks to avoid the transfer of the $231,000.00 as a pre-petition preferential transfer of the Debtor's property pursuant to 11 U.S.C. § 547(b), or alternatively as an unauthorized post-petition transfer of property of the estate pursuant to 11 U.S.C. § 549. The Trustee also seeks recovery of the funds from Defendant Carol Simpson as an initial transferee pursuant to 11 U.S.C. § 550(a)(1). On March 5, 2010, the Court approved the Trustee's

---

[1]    Various pleadings and documents filed in this case reference this Defendant as "Sarepta" Wilson, but the original Adversary Complaint and Court's case caption names "Serepta" Wilson.

settlement with Defendant Lillian Maresch ("Maresch") and she is no longer a party to this lawsuit.

An attempt to make sense out of the factual and legal puzzle that this case presents has been quite difficult and, after much effort, the Court concludes that pieces are simply missing or do not fit.

From the testimony and documents available in the record, the Court finds as follows:

## FACTS

1. Debtor filed a petition for Chapter 11 protection in this Court on May 4, 2006.

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and Local Civil Rule 83.IX.01 (DSC). This is a core proceeding pursuant to 28 U.S.C. § 157.

## The parties and their roles

3. Before the bankruptcy case was filed, Defendants Maresch, the Wilsons and Simpson were involved with the Debtor in the purchase of various parcels of real estate.

4. Plaintiff Trustee was appointed after conversion to Chapter 7 on May 4, 2007.

5. Simpson is an attorney with a law practice in Greenville, South Carolina. Simpson is also the daughter of Sarepta Wilson, and the stepdaughter of Van Wilson. She represented herself and the Wilsons at trial, and also testified as a witness.

6. Simpson met Maresch through dealings with a banker they both knew. Maresch testified that her relationship with Simpson was a business relationship.

7. Simpson's law firm handles real estate transactions and she maintains an attorney escrow/trust account. Simpson testified that she was asked by Maresch and the Wilsons

to act as an escrow agent and manage the flow of money between them and the Debtor during their business dealings. Simpson's escrow/trust account served as a central location for funds related to transactions between the parties. Records of the transactions were noted by Simpson on a ledger titled "Judd Deposits."

8.      Simpson assisted with some transactions between the parties in her capacity as an attorney. Simpson testified that she had no control over the funds in her escrow/trust account and that she was at all times acting as a conduit for the parties by transferring funds between the parties per their instructions. Maresch testified that Simpson had no authority to act on her behalf without instructions.

9.      The Debtor testified that she purchased one property initially in her name, and afterwards the Debtor purchased additional units with others whose credit would enable financing of the new purchases. The Debtor testified that all of the original closings took place during the first quarter of 2005. Certain parties assisted with the Debtor's acquisition of property by lending their credit scores to her, appearing as co-purchasers of property and co-obligors on mortgages. 11 units were purchased in Mariner's Club, in Moore County, Florida, as well as an additional property known to the parties as "Spanish Main." Properties purchased in Mariner's Club in 2005 included Units 203, 206, 603, 701, 703, 704, 708, 710, 711, 806, and 902.

10.      Mr. Wilson signed three mortgages to facilitate the purchase of units 206, 704, and 806. Mrs. Wilson signed three mortgages to facilitate the purchase of units 603, 708, and 203. The Debtor's father-in-law assisted with the purchase of units 701, 710, and 711. The parties' alleged intention was to subsequently refinance certain purchased properties to remove the equity therein, and also to remove the assisting party from the

scenario, leaving the Debtor as sole owner.  The names of additional parties listed on the deeds (i.e., Maresch and the Wilsons) would then be removed if necessary.

11.    The Debtor testified that the properties were purchased with the intention of refinancing them, removing the equity, and purchasing other properties.  The Debtor's motivation was to raise capital for her husband's business and to try and make a profit.

12.    The relationship between the parties allegedly resulted in loans from Maresch and the Wilsons to the Debtor. Maresch testified that her loans were for investment purposes, that she was helping the Debtor develop her business, and that the first transaction went well.  The evidence does not clearly indicate the exact benefit or anticipated benefit to the Wilsons or Maresch as a result of this relationship, other than possible payment of contractual interest.

13.    The Debtor went to Florida to handle the remodeling and rental of some units, with some renting for as much as $8,000.00 per month. The Debtor was to manage certain properties and pay the mortgage payments and in return collect and keep the rental income.

14.    According to the Debtor, the agreement between the parties was largely informal and many parts of it were not reduced to writing.  According to Maresch, the informal arrangement with the Debtor appeared to work well at first, and then deteriorated over time.

### The March 24, 2005 Mortgages from the Debtor to Maresch and the Wilsons

15.    On or about March 24, 2005, the Debtor executed a mortgage in favor of Maresch, and another in favor of the Wilsons.  The Debtor testified that the mortgages she signed were not supposed to encumber properties in Florida, but rather were intended

to cover properties being constructed by the Debtor's husband that were located in Greenville, South Carolina.   Simpson countered that the mortgages executed by the Debtor were intended to cover certain Florida properties.   The mortgage to the Wilsons contains a handwritten note at the bottom indicating it was prepared by Simpson.

16.     The March 24, 2005 Mortgages state that they secure loans existing on that date, plus future advances for a total not to exceed $198,000.00 (Wilson Mortgage) and $200,000.00 (Maresch Mortgage), costs, attorneys' fees incurred in collection and any payments made by the mortgagee to protect the mortgagee's interests in the property upon Debtor's default.   There are no promissory notes or written loan agreements from the Debtor to the Wilsons in this record that existed as of that date.

17.     The Wilson mortgage states "that the total amount of existing indebtedness and future advances outstanding at any one time *may not exceed* One Hundred Ninety Eight Thousand and 00/100 Dollars ($198,000.00), plus or together with interest thereon, attorneys' fees, and court costs and to secure the performance of the undertakings prescribed in the Notes and this Mortgage by conveyance of the premises hereinafter described." (emphasis added).   The mortgage later provides the following in relation to advances:

> It is understood and agreed that all advances heretofore, now and hereafter made by Mortgagee or Mortgagor, and all indebtedness now and hereafter owed by Mortgagor to Mortgagee, and any other present or future indebtedness or liability of Mortgagor to Mortgagee, whether as principal debtor, surety, guarantor, endorser, or otherwise, will be secured by this instrument until it is satisfied of record.

18.     The two March 24, 2005 Mortgages in evidence are virtually identical and they attach exhibits that refer to security including several units at Mariner's Club.   The units are listed therein in the following order: Unit 708, 704, 206, 603, 711 and 806 (The

mortgages did not include Mariner's Club units 203, 701, 703, 710 or 902).[2]  The Debtor testified that she did not believe that the exhibits attached to the mortgages, indicating the encumbered Mariner's Club units, were attached when she signed the mortgages and that she did not know that certain properties on the exhibit were included as collateral at the time she signed.  Simpson offered testimony to contradict Debtor's assertions.

19.    After each unit number on the exhibits, a more detailed property description is provided.  Starting with Unit 704, the description states that each property is "more particularly described as *Lot 4, Block 7*, Key Largo North . . . ."  This lawsuit involves the sale of Unit 603.  While this "more particularly described as" information is correct for Unit 704, it is not correct for Unit 603.[3]

20.    The March 24, 2005 Mortgages were not immediately recorded on the public record and there was no evidence indicating that the Debtor, Simpson, the Wilsons or Maresch expected them to be immediately recorded as evidence of an encumbrance on the title to the units in Mariner's Club, or any other property, to provide notice to third parties of the encumbrances.  Simpson offered an explanation that the mortgages were not recorded immediately because it was expensive to do so.

**Evidence of debts that may be owed by Debtor to Maresch and the Wilsons**

21.    The record includes a promissory note from Debtor to Maresch dated June 28, 2005 for $200,000.00.  The promissory note states that it "is secured by a mortgage of

---

[2]    The "Exhibit A" attached to Defendant Maresch's mortgage references an additional property in "CUTTHROAT HARBOR ESTATES."  Aside from that minor difference, the exhibits are identical.

[3]    An Affidavit as to Correct Legal Description was later executed by the Wilsons, notarized by Ms. Simpson, and filed post-petition on May 22, 2006.  It states that the legal descriptions for the Lot and Block numbers of the original Exhibit A filed in Florida on November 2, 2005, were incorrect and attaches a corrected Exhibit A.  On September 10, 2009, this Court entered an Order, as a result of the parties' cross motions for summary judgment, which found that the property description in the March 24, 2005 Mortgages was not so unclear as to invalidate any security interests of Maresch and the Wilsons.  Relevant portions of that Order are incorporated herein by reference.

even date," although such a document is not in the record.  The promissory note was dated more than three months after the March 24, 2005 Mortgages were signed.  The Defendants' Answer admits the Trustee's allegation that the loan occurred on or around June 28, 2005.

22.     The record includes a promissory note from Debtor to the Wilsons dated July 1, 2005, for $198,000.00.  However, in the Wilsons' Answer they state that they made the loan to Debtor in this amount in December of 2004, not July of 2005.  The Debtor also testified that the $198,000.00 was loaned around December 2004.  The promissory note states that it "is secured by a mortgage of even date," although such a document is not in the record.  The promissory note was dated more than three months after the March 24, 2005 Mortgages were executed.

23.     Although the Debtor was to rent the properties and pay superior mortgages to third parties that encumbered the Mariner's Club Units, she was unable to maintain all of the payments.  Numerous reasons were given, including bad weather that reduced rentals.  As a result, the Wilsons made withdrawals/loans from the equity in their home to keep several of the properties out of foreclosure.  Apparently, they borrowed money to make payments on mortgages owed to other creditors with liens on the properties.  The evidence shows that the Wilsons made mortgage payments on units 203, 603, 708, 701, and 710.

24.     Towards the end of 2005, the relationship between the Debtor and the Defendants began to deteriorate.  The witnesses testified that as a result, Maresch and the Wilsons wanted to get their money back from their "investments" made in Mariner's Club.  Therefore, they recorded the March 24, 2005 Mortgages to Maresch and the Wilsons on

the public record in Monroe County, Florida on November 2, 2005.  From the Debtor's testimony it was clear that she did not participate in or approve of this action at that time and was not happy about it.  The recording information reflects that the mortgages were recorded at the same time, but the Maresch Mortgage is recorded at Book # 2162, Page # 636, and the Wilsons' Mortgage is recorded thereafter at Book # 2162, Page # 640.[4]

25.      The evidence includes a document dated November 3, 2005, titled "Agreement" signed by the Wilsons, Maresch and Simpson.  The Debtor did not sign the agreement.  A copy is attached hereto and incorporated herein.   Simpson asserts that it is an "intercreditor agreement" that establishes the priority of payment between the parties.  The agreement does not indicate that Simpson's role in the matter was limited to that of an attorney or escrow agent.

26.      The record includes correspondence between the parties giving the Court a glimpse into their relationship and the alleged debts as follows:

a.      A March 15, 2006, letter from the Debtor to attorney David Nicnick, instructing that he should remit specific amounts to the Wilsons and Maresch after the anticipated closings of a sale of Units 603 and 708.  The exhibit also shows the Debtor's view of payments due to Sarepta Wilson and Maresch to be made at that time from any sale of Units 603 and 708.  The letter states that Sarepta Wilson should receive $103,748.00 at the closing of Unit 603 and $103,290.00 at the closing of Unit 708.  The letter further provides that Maresch should receive $31,500.00 at the closing of Unit 603 and $84,500.00 at the closing of Unit 708.  No explanation for the proposed distribution is included.  The letter further

---

[4]      The Court held a hearing on the parties' cross-motions for summary judgment on April 23, 2009, denying both motions.  At that time, the parties stipulated that Florida uses a Grantor-Grantee index for recordation of official real estate records.

states, "[p]lease remit the funds per the wiring instructions you received from the Carol Simpson Law Offices."  The record does not indicate that the Debtor's instructions were ever followed when the actual closings took place;

b.    A March 15, 2006, letter from the Debtor to attorney Pat Kelley, instructing him to remit specific amounts to the Wilsons and Maresch after the anticipated closing of Unit 203 (not included in the March 24, 2005 Mortgages).  The letter states that Sarepta Wilson should receive $102,521.00 and Maresch should receive $84,500.00.  No explanation for the proposed distribution is included.  This letter also states that the funds should be remitted using the wiring instructions received from the Carol Simpson Law Offices.  From the record, it does not appear that any closing took place for Unit 203;

c.    A March 19, 2006, letter from Maresch and the Wilsons to Nicnick.  The letter states that it is a response to his "request for a breakdown of the payoff on Unit 603 . . . sent on March 7, 2006."  The letter further discusses the payments on Units 701 and 710 (not part of the March 24, 2005 Mortgages).  It stated that Maresch and the Wilsons believed the Debtor wanted to repurchase these two units, and states that Maresch and the Wilsons were making the mortgage payments to a third party "[i]n good faith . . . to ensure that those units would be available to [the Debtor]."  Maresch and the Wilsons further stated that if the Debtor no longer wished to repurchase those units, they would "immediately cease making [mortgage] payments and advertise [701 and 710] for sale."  The letter also discusses an additional loan made by Maresch to Debtor of $100,000.00, advises that Simpson cannot agree to anything that is not

9

authorized by Maresch and the Wilsons, and contains some discussion of disagreements between the parties.  The letter ended by stating the total amount due to the Wilsons and Maresch as a result of their mortgages and advances as of March 15, 2006, was $513,999.26;

d.   A letter dated April 2006 from an attorney in Florida to Simpson discussing negotiations between the Debtor and Defendants to settle outstanding business between the parties.  The letter states that the Debtor intended to enter into closings on Units 603 and 708 and that the mortgage claims would be paid in full as a result of the sales.  The letter also requests a "unit-by-unit breakdown as to the amount of debt attributable to each of the various units encumbered by the Wilson and Maresch mortgages."  Such a breakdown does not appear to have been provided or at least is not found in the record.

### Debtor's sales/transfers of properties

27.    In June 2005 the mortgages owed to third parties (not the Wilsons or Maresch) encumbering Units 206, 704, and 806 were refinanced and Mr. Wilson's name was removed from the deeds and mortgages.   These three properties were also listed as collateral in the March 24, 2005 Mortgage to the Wilsons executed three months before and recorded in November of 2005.

28.    On June 23, 2005, units 701 and 710 (not included in the March 24, 2005 Mortgages) were transferred to Simpson.  Simpson paid the down payment on these units from funds in her attorney trust/escrow account, marking the "Judd Deposits" ledger accordingly.  At the closing of unit 701, Simpson provided $111,396.42 per the "Judd Deposits" ledger account to fund the down payment for Simpson's purchase of the

property from the Debtor/Judd, and $411,186.36 was placed back in Simpson's escrow/trust account from loan proceeds after the closing.  At the closing of unit 710, Simpson provided $101,096.32 for her purchase of the property from the "Judd Deposits" ledger account to fund the down payment, and $388,063.87 from loan proceeds after the closing was placed back in Simpson's escrow/trust account.  Simpson testified that at that point she was "legally responsible" for Units 701 and 710 and the mortgages encumbering the properties.  Simpson testified that her intention was to sell the properties.

29.     In December of 2005, the Debtor sold Mariner's Club Unit 711 and as a result $135,000.00, a portion of the proceeds, was deposited into Simpson's escrow/trust account.

30.     On April 27, 2006, shortly before she filed bankruptcy on May 4, the Debtor sold/transferred her interest in Unit 603 to her father, John T. Holt ("Holt").  Holt financed the transfer of the property from Debtor with loans from and granted mortgages to third party lenders, and the resulting sales proceeds were placed in the closing agent's escrow account to pay claimed encumbrances thereon.  The Settlement Statement indicates a sales price of $1,350,000.00 and indicates payments for "Payoff of first mortgage loan to American Home Mtg" and "Payoff of second mortgage loan to EMC Mortgage," and the sum of $231,000.00 was earmarked to "Payoff of third and fourth mortgage."  Defendants assert that the last amount was a payment to Maresch and the Wilsons to obtain a Partial Release of Unit 603 from the March 24 Mortgages.  The Settlement Statement indicates significant funds remaining from the sale of Unit 603 for the Debtor/Seller.  The Trustee stated at the trial, and it was not disputed, that some of the

figures in the Settlement Statement are incorrect, but any inaccuracies were not explained in detail.  Comprehensive Title Company served as the closing agent.

31.     Apparently Unit 708 sold as well, as the Wilsons and Maresch signed partial releases of their mortgages on Units 603 and 708.  The releases were executed on April 27, 2006.[5]

## The receipt and distribution of sales proceeds to Maresch and the Wilsons

32.     Simpson provided evidence of receipt of a total of $597,000.00 in sales proceeds from Units 711, 603 and 708 at Mariner's Club.  The sum of $135,000.00 was received by Simpson around December of 2005 and the Trustee has made no claims herein for recovery of any of those funds.  However, the receipt of the funds is directly relevant to the balance of alleged debts owed by the Debtor to the Wilsons.

33.     The remaining $462,000.00 was wired into Simpson's escrow/trust account as a result of the sale of Units 603 and 708.[6]  In a Rule 2004 Examination[7] of Nicnick he testified that on May 4, 2006, Comprehensive wired $231,000.00 to Ms. Simpson for Unit 603.  Nicnick admitted, however, that he did not know the exact time of day the wire was sent, that his bank did not send wire transfers after 3:00 p.m., and any question

---

[5]     At the time the Debtor filed bankruptcy, the deed transferring Unit 603 to Debtor's father and the mortgages thereon that he obtained to accomplish the transfer were not yet recorded on the public record. The Trustee previously filed related A/P No. 08-80012, *Anderson v. John T. Holt, SunTrust Mortgage, Inc., and EMC Mortgage Corp.*, seeking recovery of Unit 603 from Holt as a fraudulent conveyance pursuant to 11 U.S.C. § 548.  Holt did not answer the Complaint, and the Court entered a default judgment against Holt voiding the deed received from Debtor.  Holt's default resulted in Trustee's recovery of Unit 603.  The Trustee sold Unit 603 pursuant to an order of this Court and is holding the sum of $391,336.78, with any liens attaching to the proceeds of the sale pending resolution of any lien issues.  Co-defendants in that adversary, SunTrust and EMC, asserted liens on the proceeds and the Trustee challenged their liens pursuant to 11 U.S.C. § 544(a)(3).  This Court granted summary judgment to SunTrust and EMC Mortgage in that matter on August 6, 2009, which would require payment of the sales proceeds to those co-defendants.  At this time an appeal of that decision is pending.
[6]     $231,000.00 was received for Unit 603 and another $231,000.00 was received for Unit 708.  The Trustee is only challenging the validity of the $231,000.00 received from Unit 603.
[7]     Federal Rule of Bankruptcy Procedure 2004.

regarding the exact time the wire was sent would be a question that only his bank could answer.

34.    The Debtor's bankruptcy petition was filed with the Court electronically at 3:35 p.m. on May 4, 2006, per the Court's records.[8]

35.    Simpson's bank records show two $231,000.00 wire transfers as "incoming" the day after the Debtor filed for bankruptcy protection, completed at 11:14:26 a.m. and 11:14:31 a.m. on May 5, 2006.  These resulted from the sales proceeds of Units 603 and 708.

36.    Simpson testified that $574,775.91 of this amount, deposited into her escrow/trust account, was disbursed to the Wilsons as follows:

a.    $94,126.55 to reimburse the Wilsons for mortgage payments that they paid to third parties who held mortgages on Mariner's Club Unit 203, $84,175.22 to reimburse the Wilsons for mortgage payments that they paid to third parties who held mortgages on Mariner's Club Unit 701, and $103,885.50 to reimburse the Wilsons for mortgage payments that they paid to third parties who held mortgages on Mariner's Club Unit 710.  These Units were not included in the March 24, 2005 Mortgages and Units 701 and 710 were acquired by Simpson from the Debtor on June 23, 2005;

b.    $60,348.86 to reimburse the Wilsons for mortgage payments that they paid to third parties who held other mortgages on Mariner's Club Unit 603 and $59,565.53 to reimburse the Wilsons for mortgage payments that they paid to

---

[8]    In related matter *Anderson v. Holt, SunTrust Mortgage, Inc., and EMC Mortgage Corp. (In re Judd)*, C/A No. 06-01888-hb, Adv. Pro. No. 08-80250-hb, slip op. (Bankr. D.S.C. Aug 6, 2009), the order granting summary judgment incorrectly stated the time as 3:55 p.m.

third parties who held other mortgages on Mariner's Club Unit 708. These Units

were included in the March 24, 2005 Mortgages;

c.    $4,450.65 to the Wilsons for recording fees related to the properties;

d.    $14,203.60 to the Wilsons for interest and $154,000.00 for principal related to

the July 1, 2005 promissory note in the amount of $198,000.00 from the Debtor.

37.    Simpson's testimony and documents further show that Maresch was disbursed

$22,246.08[9] for interest payments related to her loans to the Debtor.    Maresch and

Simpson both testified that Maresch had not received any payment towards the principal

amount owed by the Debtor to her as a result of the promissory note at the time of these

distributions.

## DISCUSSION AND CONCLUSIONS OF LAW

**I.    Identifying the Transfer in Question and When it Occurred.**

If a transfer of the Debtor's property occurred pre-petition, the Trustee seeks

recovery of the $231,000.00 in sales proceeds pursuant to 11 U.S.C. § 547(b) as a

preference.    11 USC §547(g) states that the Trustee bears the burden of proof in a

preference action.  *Hovis v. Summit Security Services, Inc. (In re Air South Airlines, Inc.)*,

97-07229-W, Adversary No. 99-80297-W, slip op. at 7 (Bankr. D.S.C. 3/7/00).    If a

transfer occurred post-petition, the Trustee seeks recovery under § 549.  Fed. R. Bankr. P.

6001 states that "[a]ny entity asserting the validity of a transfer under § 549 of the Code

shall have the burden of proof."    Defendants are asserting the transfer is valid and

therefore bear the burden of proof on this issue.

---

[9]        This amount added to the amounts received by the Wilsons totals $597,001.99.

14

### A.     The wire transfer was a post-petition transfer.

The Trustee asserts that the relevant transfer was the wire transfer of $231,000.00 in sales proceeds from Unit 603 from Comprehensive Title, the closing agent, to Simpson's escrow/trust account around the date and time the bankruptcy was filed.  He supports his argument that this was a post-petition transfer with the case of *Barnhill v. Johnson*, 112 Sup. Ct. 1386 (1992).  In *Barnhill*, the Supreme Court held that a payment by check is effective when it is honored by a drawee bank.  Courts have held that wire transfers are the "equivalent of honored funds and are deemed transferred when the recipient receives the electronic transmission."  *In re Pioneer Commercial Funding Corp.*, 140 B.R. 951 (Bankr. S.D.N.Y. 1992); *see also Leonard v. Optimal Payments Ltd. (In re Nat'l Audit Def. Network)*, 332 B.R. 896 (Bankr. D. Nev. 2005).  In other words, the ownership interest of funds transferred by wire "passes from the originator to the beneficiary's bank upon completion of the transfer and acceptance by the receiving bank."  *Community Bank, F.S.B. v. Stevens Fin. Corp.*, 966 F. Supp. 775, 786 (N.D. Ind. 1997); *see also United States v. BCCI Holdings (Lux.), S.A.*, 956 F. Supp. 5 (D.D.C. 1997) ("Upon completion of a wire transfer, the funds simply become part of the general deposits of the bank, and the transferee becomes a general depositor of the bank. . . . At that point, the beneficiary bank acquires an ownership interest in the transferred funds . . . .").

The evidence in this record indicates that the wire transfer from Comprehensive Title's bank to Simpson's bank was completed post-petition.  Simpson's bank records list the transfers[10] as "incoming" on May 5, 2006, and show other, unrelated wire transfers

---

[10]     The transfers involve both payments of $231,000.00 received from the closings of Unit 603 and Unit 708.

being completed in the days before and after May 5, 2006.  The ownership of funds

received by wire changes upon "completion of the transfer and acceptance by the

receiving bank."  *Community Bank*, 966 F. Supp. at 786.

> **B.      The post-petition wire transfer resulted in a transfer of property of the estate.**

The Trustee seeks recovery pursuant to § 549:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee
> may avoid a transfer of property of the estate--
> > (1) that occurs after the commencement of the case; and
> > (2) (A) that is authorized only under section 303(f) or 542(c) of
> > this title; or
> > > (B) that is not authorized under this title or by the court.

Defendants argued that the $231,000.00 wired was in the hands of an escrow agent,

Comprehensive Title, or in transit at the time the Debtor filed for bankruptcy protection

and that the bankruptcy estate no longer had an interest in these proceeds.  **"**In order for a

transfer to be voidable by the trustee, the transfer must be of property of the estate."  5-

549 Collier on Bankruptcy P 549.04.   Section 541(a)(1) states that "property of the

estate" consists of "all legal or equitable interests of the debtor in property as of the

commencement of the case."   This is quite broad and includes "all of the debtor's

interest, legal and equitable; every conceivable interest of the debtor, future non-

possessory, contingent speculative, and derivative, is within the reach of the statutory

provision defining estate property."   *Hoagland v. Edward Hines Lumber Co. (In re

LWMcK)*, 196 B.R. 421, 423 (Bankr. S.D. Ill. 1996).   "The primary consideration in

determining if funds are property of the debtor's estate is whether payment of those funds

diminished the resources from which the debtor's creditors could have sought payment."

*In re Southmark*, 49 F.3d 1111, 1117 (5th Cir. 1995).

At the relevant times the funds in question were in escrow for the benefit of all parties to the transaction and then in transit to pay the Debtor's alleged secured debts. Until the funds were received by Simpson, and arguably even after that time if she was merely a conduit in the transaction, they fall within the broad scope of property of the estate. Therefore, the wire transfer from the escrow agent or any other source to Simpson was a post-petition transfer of property of the estate.

### C.     The Defendants have the burden of proof.

Because the transfer in question occurred after the Debtor filed her bankruptcy case, Defendants have the burden of proving that the post-petition transfer was valid to defeat the Trustee's causes of action pursuant to § 549. Fed. R. Bankr. P. 6001.

## II.     Trustee's claims against Simpson pursuant to § 550(a)(1).

Simpson is the initial party that received the funds in question. They were wired to her escrow/trust account. Section 550(a)(1) provides that a Trustee may recover property from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." "[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (1988). The Fourth Circuit has "recognized that the initial transferee of property is not always the initial recipient of the property, . . . and that a party cannot be an initial transferee if he is a 'mere conduit' for the party who had a direct business relationship with the debtor." *In re Southeast Hotel Properties Ltd. Partnership*, 99 F.3d 151, 155 (4th Cir. 1996).

Recovery can only be had to the extent that the transfer is avoided under § 547 or § 549. 11 U.S.C. § 550(a); *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389

B.R. 721 (B.A.P. 9th Cir. 2008).  Once a transfer is avoided, the estate's recovery may

come from "(a) the initial transferee; (b) the party for whose benefit the initial transfer

was made; and/or (c) any subsequent transferee."  *IBT Int'l, Inc. v. Northern (In re Int'l*

*Admin. Servs.)*, 408 F.3d 689 (11th Cir. Fla. 2005).  However, double recovery is not

permitted—the trustee is entitled to a single satisfaction as the purpose of § 550 is "to

restore the estate to the financial condition it would have enjoyed if the transfer had not

occurred."  *In re Am. Way Serv. Corp.,* 229 B.R. 496, 530-531 (Bankr. S.D. Fla. 1999).

Simpson argues that if the transfer is recoverable, she is not an initial transferee as

she did not exercise any control over the funds placed in her escrow/trust account on

behalf of the other parties.  The exact business arrangement(s) between Simpson, the

Wilsons, Maresch and the Debtor is murky on this record.  However, it does appear that

there was some business relationship—or at least some form of a relationship that

extends Simpson's role far beyond that of attorney or escrow agent. Simpson participated

in the real estate transactions between the parties related to the "Judd Deposits" ledger.

The evidence shows that she funded her purchase (down payment) of Units 701 and 710

out of the "Judd Deposits" ledger of her escrow/trust account.  Simpson explained that

Units 701 and 710 were hers and she intended to sell them and the Wilsons made

significant mortgage payments on these properties either on her behalf on for the benefit

of the Debtor.  The amounts advanced by the Wilsons for Simpson's properties were

repaid, at least partially, from the $462,000.00 (including the $231,000.00 transfer in

question) received post-petition.  Simpson's position that she was a "mere conduit"–an

uninvolved party—and was only following the instructions of others in moving money

around for their sole benefit is simply not supported by the evidence.

**III.**    **The Trustee is entitled to a judgment against Defendants pursuant to § 549 to recover the post-petition transfer of $231,000.00.**

Section 549(a)(2)(B) provides that "the trustee may avoid a transfer of property of the estate . . . that is not authorized under this title or by the court." For a transfer to be authorized by the Court, a party would have to seek authorization from the Court prior to the transfer in question. *See generally Schnittjer v. Burke Constr. Co. (In re Drahn)*, 405 B.R. 470 (Bankr. N.D. Iowa 2009); *Weiss v. People Sav. Bank (In re Three Partners)*, 199 B.R. 230 (Bankr. D. Mass. 1995). Post-petition transfers to secured creditors are not expressly authorized by the code; however, courts have prevented avoidance of post-petition payments, on practical grounds, to secured parties that satisfy valid security interest. *Weiss*, 199 B.R. at 236 (providing that there was no reason to avoid payments to a secured creditor who received payments from the proceeds of its prepetition collateral as neither the estate nor any other creditor would be benefitted); *Schnittjer*, 405 B.R. at 476-77 (finding that the Trustee could recover the portion of proceeds over and above the secured party's secured interest).

If the Wilsons were entitled to receive the $231,000.00 in sales proceeds from the estate due to a valid, enforceable, and fully secured mortgage, attaching to the property sold and therefore the proceeds, then the transfer of the funds is arguably authorized and appropriate and may not be recoverable by the Trustee. However, the facts do not support such a result.

Simpson received $597,000.00 in her escrow/trust account from the sale of properties, and later disbursed the total amount of $574,775.91 to the Wilsons. Of that $597,000.00, $462,000.00 was received in her account post-petition and $135,000 in December of 2005.

The March 24, 2005 Mortgage states "that the total amount of existing indebtedness and future advances outstanding at any one time *may not exceed* One Hundred Ninety Eight Thousand and 00/100 Dollars ($198,000.00), plus or together with interest thereon, attorneys' fees, and court costs and to secure the performance of the undertakings prescribed in the Notes[11] and this Mortgage by conveyance of the premises hereinafter described."    The mortgage later provides the following in relation to advances:

> It is understood and agreed that all advances heretofore, now and hereafter made by Mortgagee or Mortgagor, and all indebtedness now and hereafter owed by Mortgagor to Mortgagee, and any other present or future indebtedness or liability of Mortgagor to Mortgagee, whether as principal debtor, surety, guarantor, endorser, or otherwise, will be secured by this instrument until it is satisfied of record.

Fla. Stat. § 697.04(b) provides the following regarding future advances and the total amount of indebtedness that may be secured by a mortgage:

> The total amount of indebtedness that may be so secured may decrease or increase from time to time, but the total unpaid balance so secured at any one time shall not exceed a maximum principal amount which must be specified in such mortgage or other instrument, plus interest thereon.

In other words, the Florida statute requires a statement regarding the maximum principal amount secured by a mortgage seeking to secure future advances.   *United States v. American Nat. Bank of Jacksonville*, 255 F.2d 504 (5th Cir. 1958) (holding that failing to state a maximum amount of indebtedness as required by Fla. Stat. § 697.04 prevented certain future advances from being secured, despite the mortgage's language including a dragnet clause); *see also Downing v. First Nat'l Bank*, 81 So. 2d 486 (Fla. 1955) (finding that while a future advance clause may be valid, Fla. Stat. § 697.04 limits the scope of

---

[11]    It is not clear what "Notes" are referenced—the Mortgage says it secures a "note of even date" that is not in evidence.  The only note is the July 1, 2005 promissory note executed after the mortgage.

provisions for future advances).  This statutory provision also applies to dragnet and cross-collateralization clauses.  *Uransky v. First Federal Sav. & Loan Asso.*, 684 F.2d 750 (11th Cir. 1982); *Garrote v. Ocean Bank*, 713 So.2d 1095 (Fla. Dist. Ct. App. 3d Dist. 1998).  "Dragnet clauses are those which purport to secure all debts, past present and future, between the parties to a security agreement.  These clauses are generally disfavored and narrowly construed." *Uransky*, 684 F.2d at n. 5.

The Court need not decide if each and every dollar received was applied to a valid, enforceable debt.  The Court must only determine if the Defendants have met their burden of proof under § 549 such that the Court can find that the post-petition transfer of the $231,000.00 in estate property in question was authorized.  The facts here indicate that the Wilsons received a total of $574,775.91 in payments that they claim were applied to the March 24, 2005 Mortgage in the principal amount of $198,000.00.  Although the Wilsons claim that the Debtor owed, and there is some evidence that the Debtor may have owed, a variety of debts to the Wilsons as a result of loans, advances and business dealings between the parties, the alleged obligations are informally documented if at all and are not easily tied to the March 24, 2005 Mortgage.  As the testimony indicated, the agreements between the parties were largely informal and many parts were not reduced to writing.  This informality coupled with the unconventional nature of the alleged obligations and relationships does not benefit the Defendants in this matter.

The party asserting the validity of the transfer must meet the burden of proof by a preponderance of the evidence.  "A preponderance of the evidence means an amount of evidence that is sufficient to persuade the finder of fact that a claim or contention is more likely true than not true." *In re Lee Memory Gardens, Inc.*, 2006 WL 996567 (Bankr.

M.D.N.C. 2006). From this record the Court cannot conclude by a preponderance of the evidence that all of these alleged obligations paid are secured by the March 24, 2005 Mortgage as a matter of fact or law. Defendants have presented a jumble of facts that provide some evidence, but not enough, of various obligations that may have been owed by the Debtor to the Wilsons. However, Defendants have not met their burden of proving that the transfer of $231,000.00 in proceeds from the sale of Unit 603 was paid post-petition to satisfy a debt outstanding at that time that was valid, enforceable, and fully secured by the sales proceeds. It is more likely than not from this record that the March 24, 2005 Mortgage, if it secured any of the debts in question, was satisfied by payment of some or all of the $135,000.00 from the sale of Unit 711 and the $231,000.00 received from the sale of Unit 708.

**IV.    If the transfer was a post-petition transfer, the Trustee could prevail on his preference claims pursuant to § 547(b).**

If the Court's initial findings are incorrect and the transfer of the Debtor's property occurred pre-petition, Trustee seeks avoidance of the payment of $231,000.00 to the Wilsons pursuant to § 547(b) as a preferential transfer. Section 547 provides:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
> (A) the case were a case under chapter 7 of this title.

22

(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The factors that must be met to allow the Trustee to recover on his preference cause of action are clearly present in the facts above and do not warrant further discussion, except for one: Was the Debtor insolvent when the transfer was made?

Section 101(32)(A) states that insolvency is present when "the sum of [an] entity's debts is greater than all of such entity's property, at fair valuation . . . ." Section 547(f) provides that for purposes of said section, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date . . . of the petition." Although the Trustee carries the burden of proof in a preference action, the presumption of insolvency must be rebutted by the creditor, which requires said creditor produce some evidence to the contrary. *In re Economy Milling Co., Inc.*, 37 B.R. 914, 918 (D.S.C. 1983).

It is clear that the presumption of insolvency applies in this case—if the transfer was pre-petition, it was clearly within 90 days of the filing. Further, the testimony indicates that the Debtor was not able to make mortgage payments due and was not able to pay the obligations owed to the Wilsons and Maresch before filing. The Defendants became anxious about her financial situation in November of 2005 and changed their course of action as a result. The Wilsons have not only failed to present any evidence to rebut the presumption of insolvency, but they have also provided additional support for a finding of insolvency.

## CONCLUSION

The Wilsons and Simpson are jointly and severally liable to the estate for the return of $231,000.00 in estate funds transferred post-petition pursuant to 11 U.S.C. §§549 and 550.  A separate judgment will be entered.

## AGREEMENT

This Agreement ("Agreement") memorialized this 3rd day of November 2005, by and between Lillian S. Maresch ("Maresch"), B. Van Wilson, Sarepta P. Wilson and Carol A. Simpson ("Simpson") (collectively "the Parties").

Whereas, the Parties have made various loans to Lee H. Judd and investments in real estate units in Mariners Club, Key Largo, Florida with Lee H. Judd;

Whereas, Lee H. Judd signed various mortgages and made various promises regarding payments of principal, interest, and amounts advanced under said mortgages;

Whereas, Judd has promised to repay mortgage payments made by the Parties on her behalf on Units 203, 603, 701, 708, and 710;

Whereas, the Parties are becoming increasingly insecure about Lee H. Judd's ability to repay the sums owed to them; and

Whereas, the Parties have previously agreed to work together to secure repayment of all funds owed to them, the Parties acknowledge and agree to the following:

1.    The Parties are owed the following amounts:

     a.    Lee H. Judd ("Judd") owes Maresch the principal sum of $200,000, plus interest, costs, and amounts advanced. Judd gave Maresch a mortgage, which is recorded in Monroe County, Florida, on Units 206, 603, 704, 708, 711, 806, and a house known as Spanish Main to secure this loan;

     b.    Judd also owes Maresch the principal sum of $100,000 plus interest, costs, and amounts advanced. Judd gave Maresch a mortgage, which is recorded in Greenville County, South Carolina, on two parcels of real estate in Greenville County to secure this loan;

     c.    Judd owes B. Van and Sarepta P. Wilson the principal sum of $198,000, plus interest, costs, and amounts advanced. Judd also gave B. Van Wilson and Sarepta P. Wilson a mortgage, which is recorded in Monroe County, on Units 206, 603, 704, 708, 711, and 806 to secure this loan;

     d.    Judd owes Simpson for mortgage payments on Units 701 and 710, which Simpson purchased from Judd's father-in-law and for which Judd agreed to make all mortgage payments in exchange for the right to rent the units; and

     e.    Judd owes Sarepta P. Wilson for mortgage payments on Units 203, 603, and 708 which Sarepta P. Wilson purchased with Judd with the agreement that Judd was to make all mortgage payments in exchange for the right to rent said units.

2.   Collectively, the Parties have the following sources from which to recoup the monies
     owed to them:
     a.   Proceeds from Units 206, 603, 704, 708, 711, 806, and a house known as Spanish
          Main;
     b.   Proceeds from the two parcels in Greenville, SC; and
     c.   Proceeds from Units 203, 701, and 710.

3.   The Parties agree that Judd should be able to continue extracting her equity in these
     properties as she has been successful in refinancing as follows:
     a.   B. Van Wilson purchased three units with Judd, specifically Units 206, 704, and
          806, for which Judd was to make all mortgage payments in exchange for the right
          to rent the units. Judd made all mortgage payments on these units as agreed
          before successfully refinancing them into her name and removing B. Van Wilson
          from the mortgage and deed during June 2005; and
     b.   Judd successfully refinanced Unit 902 in June 2005.

4.   As the refinancings occur, the Parties agree, with the understanding that Judd concurs,
     that all monies received shall be applied in the following order:
     a.   First, to repayments for all mortgage payments made on Units 203, 603, 701, 704,
          and 710;
     b.   Second, to payments advanced under the mortgages on Units 206, 603, 704, 708,
          711, 806, and a house known as Spanish Main;
     c.   Third, to interest owed to the Parties under any loans made to Judd;
     d.   Fourth, to principal owed to B. Van Wilson and Sarepta Wilson because they
          borrowed the funds that they loaned to Judd and they are making and must
          continue to make payments on Unit 203, 603, and 708;
     e.   Fifth, to principal owed to Maresch.

IN WITNESS HEREOF, the parties hereto have executed this Agreement as of the day and year
first written above.

_____            _____
B. Van Wilson                        Lillian S. Maresch

_____            _____
Sarepta P. Wilson                    Carol A. Simpson